Elaine **CONLEY**, an individual; Dorothy **White**, an individual; and Weldon **White**, an individual, Plaintiffs,

v.

**R.J. REYNOLDS TOBACCO CO., et al., Defendants.**

No. C 00–1740 SBA.

United States District Court, N.D. California.

Dec. 26, 2002.

Perry S. Dobson, Hayward, CA, for Plaintiffs.

Richard D. Shively, Thomas G. Scarvie, Howard Rice Nemerovski Canady Falk & Rabin, San Francisco, CA, Stephanie A. Schrandt, Barbara A. Brill, Shannon Spangler, Shook Hardy & Bacon LLP, San Francisco, CA, Ingrid von Kaschnitz, Howard Rice Nemerovski Canady Falk & Rabkin, San Francisco, CA, Stephen Kaczynski, Sevan Ogulluk, Jones Day Reavis & Pogue, Cleveland, OH, Lynn A. Airasian, Bonnie L. Hemenway, Jones Day Reavis & Pogue, New York City, Alicia J. Donahue,

Shook Hardy & Bacon LLP, San Francisco, CA, Gregory G. Little, Catherine B. Stevens, Hunton & Williams, New York City, for Defendants.

## ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

ARMSTRONG, District Judge.

At the close of plaintiffs' case-in-chief at trial, defendants filed two motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a): Defendants' Joint Motion for Judgment as a Matter of Law (the "Joint Motion") and Defendant R.J. Reynolds Tobacco Company's Motion for Judgment as a Matter of Law ("Reynolds' Motion").[1] Plaintiffs have filed respective oppositions to the motions.

These motions are now before the Court. Having read and considered the papers submitted, having reviewed the transcript of the proceedings, and being fully informed, the Court DENIES the motions WITHOUT PREJUDICE to their being renewed after plaintiffs have been afforded an opportunity to correct the evidentiary deficiencies identified in this Order.

### *LEGAL STANDARD*

■ Federal Rule of Civil Procedure 50(a)(1) provides:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

In entertaining a motion for judgment as a matter of law, a federal court sitting in diversity is bound to apply state law in determining whether the evidence is sufficient to support a verdict in favor of the non-moving party. *See In re Beverly Hills Fire Litig.,* 695 F.2d 207, 218–19 (6th Cir.1982) (applying Kentucky law to determine whether the evidence in the record was sufficient to support the causation element of the plaintiffs' state-law cause of action and thereby prevent entry of judgment as a matter of law against the plaintiffs).

■ Where a non-moving party has failed to present sufficient evidence to withstand judgment as a matter of law under Rule 50, the Court may not enter judgment in favor of the moving party without first apprising the non-moving party of the material deficiencies in the evidence and affording it an opportunity to present additional evidence on the dispositive facts to correct those deficiencies. *Waters v. Young,* 100 F.3d 1437, 1441–42 (9th Cir.1996) (reversing judgment and remanding case for new trial after entry of judgment as matter of law due to district court's failure to apprise plaintiff of evidentiary deficiencies and to afford plaintiff opportunity to present evidence to correct deficiencies). This condition applies regardless of whether the non-moving party is represented by counsel. *See id.* at 1442.

### *DISCUSSION*

Several of the arguments advanced by defendants in their motions, if accepted by the Court, would be dispositive of plaintiffs' claims, and therefore it would be unnecessary for the Court to reach the non-dispositive arguments. Because, how-

---

**1.** Reynolds' Motion incorporates the Joint Motion by reference.

ever, the Court is obligated to provide plaintiffs an opportunity to correct all their evidentiary deficiencies, the Court addresses all of defendants' arguments in order that plaintiffs are aware of all the evidentiary deficiencies in their case and that they understand the consequences of failing to correct these deficiencies.

### A. *The Joint Motion*

#### 1. *Evidence Regarding Proximate Cause of Frank White's Death*

■ Defendants' first argument is essentially one of proximate cause. Citing *Myers v. Philip Morris Cos., Inc.,* 28 Cal.4th 828, 123 Cal.Rptr.2d 40, 50 P.3d 751 (2002), and *Naegele v. R.J. Reynolds Tobacco Co.,* 28 Cal.4th 856, 123 Cal. Rptr.2d 61, 50 P.3d 769 (2002), defendants contend that they cannot be held liable on plaintiffs' claims for conduct occurring during the immunity period established in California Civil Code § 1714.45, namely January 1, 1988, through December 31, 1997; they claim that they can be held liable only for conduct occurring outside the immunity period. In light of their immunity for conduct occurring during this period, defendants assert that plaintiffs have not offered sufficient evidence for a reasonable jury to find that their products proximately caused the decedent's death. Specifically, they explain that although Dr. Wong testified that the decedent's death was caused by chronic obstructive pulmonary disease (COPD) and that "smoking" caused the decedent's COPD, there was no evidence of the extent to which the decedent's smoking outside the immunity period—the time prior to January 1, 1988, and after December 31, 1997—caused the decedent's COPD.

Plaintiffs do not dispute or otherwise question defendants' contention that they cannot be held liable for conduct during the immunity period. Further, the Court previously considered this argument in ad-judicating the parties' motions in limine and noted its agreement, (*see* Order Adjudicating Motions in Limine and Addressing Other Pretrial Matters ("MIL Order") at 21–22), and the Court perceives no reason to reconsider its previous conclusion. Accordingly, the Court agrees that defendants cannot be held liable for their sale of cigarettes or other conduct occurring during the ten-year immunity period established by California Civil Code § 1714.45.

■ Plaintiffs, however, insist that they have introduced sufficient evidence to support a finding that the decedent's smoking outside the immunity period caused his COPD. Their opposition on this point consists only of the following: "Almost all of FRANK WHITE'S smoking occurred outside of the Immunity [*sic*] Period [*sic*]. Consequently, Defendants' position has no merit." Thus, the essence (and entirety) of plaintiffs' opposition appears to be their position that a jury could reasonably conclude that, based *solely* on the fact that the vast majority of the time during which decedent smoked took place outside the immunity period, it is more likely than not that the decedent's smoking outside the immunity period was a substantial factor in bringing about his COPD (which, according to Dr. Wong, was a substantial factor in bringing about his death).

■ The Court observes that an underlying premise of plaintiffs' argument is that the jury can draw from the evidence tendered at trial *the inference that the length of time during which the decedent smoked is correlated with the likelihood of the decedent's developing COPD.* Under California law, a "judgment may be supported by inference." *Carrau v. Marvin Lumber & Cedar Co.,* 93 Cal.App.4th 281, 289, 112 Cal.Rptr.2d 869 (2001). But not all inferences are permissible: Although the inference may be based on common experience, *see Engalla v. Permanente*

*Med. Group, Inc.,* 15 Cal.4th 951, 975, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997), it must be a reasonable conclusion from the evidence and may not be based on " 'suspicion, imagination, speculation, surmise, conjecture or guesswork.' " *Carrau,* 93 Cal.App.4th at 289, 112 Cal.Rptr.2d 869 (quoting *Beck Dev. Co. v. S. Pac. Transp. Co.,* 44 Cal.App.4th 1160, 1204, 52 Cal. Rptr.2d 518 (1996)). Accordingly, the Court must determine whether, based on the evidence presented in plaintiffs' case-in-chief and on the jurors' common experience, the jury may *permissibly* draw the inference that plaintiffs desire them to draw.

Having reviewed the evidence tendered thus far, the Court concludes that the jury may not permissibly draw this inference. A review of the record reveals that there is no evidence that directly speaks to the issue of whether or to what extent the length of the period of time during which the decedent smoked was correlated with his developing COPD. But even if the jury considers other evidence in the record and attempts to infer from that evidence whether there was such a correlation, the Court concludes that the jury may not reasonably reach such an inference.

The potentially relevant evidence consists of the following: With regard to the decedent's smoking history, the evidence at trial establishes that: the decedent was born in 1918; he began smoking around 1930; he smoked Camel brand cigarettes, manufactured by defendant R.J. Reynolds Tobacco Co. ("Reynolds"), from approximately 1930 to 1973; and he smoked Marlboro brand cigarettes, manufactured by defendant Philip Morris Inc. ("Philip Morris") from 1973 to his death in 1999. As for the decedent's medical history, the entirety of the relevant evidence consists of the following: Dr. Wong testified that he first saw the decedent on October 2, 1998, and that at their first meeting, the decedent had COPD, (Tr. 627:9–23); and Dr. Wong provided expert testimony that in his opinion the decedent's "smoking" was "a cause of his COPD", (Tr. 657:3; *accord* Tr. 730:22).

This evidence is insufficient to support a reasonable inference that it is more likely than not that the decedent's smoking outside the immunity period caused his COPD. There is no evidence as to when the decedent first developed COPD; no evidence as to how long one typically must smoke to develop COPD; no evidence as to the types of cigarettes (e.g., low-tar versus high-tar) that tend to cause COPD; no evidence as to whether one is more susceptible to developing COPD from smoking based on the age at which one is smoking. It is important to bear in mind that during the immunity period, the decedent was between ages 69 and 79. Perhaps at that late stage in his life he was more susceptible to developing COPD from smoking, whereas prior to the immunity period the cumulative effects of the smoking were insufficient to cause COPD. If the evidence were such that the decedent had smoked for almost 60 years and then had died from COPD one day into the immunity period, and Dr. Wong were to testify that smoking caused his COPD, perhaps that would be a situation in which the jury might reasonably infer, based on common sense, that the smoking outside the immunity period was a cause of his death. But the evidence in the record is markedly different. Given that the immunity period was ten years long, that the decedent smoked during the entire length of the immunity period, that these ten years occurred towards the end of his life while his health was declining, and that the earliest date on which the jury may infer that the decedent had COPD was October 2, 1998 (the decedent's first visit with Dr. Wong), such an inference is not permissible. Consequently, for all the jury knows

from the evidence, it is just as likely that the decedent's COPD was caused entirely by his smoking during the ten-year immunity period as it is likely that it was caused outside the immunity period. To infer otherwise would be speculation and conjecture in its purest form.[2]

■ Nor can the jury reasonably reach the inference plaintiffs desire it to draw based to any extent on the jurors' common experience. COPD, the evidence suggests, is not a common cold; it is a label for a number of diseases that include emphysema and chronic bronchitis. COPD and the causes thereof are thus squarely and exclusively within the province of expert opinion. There is nothing to suggest that jurors have common experience with such subject matter.

■ The Court further notes that plaintiffs have made no effort to suggest how the jury could reasonably infer either that smoking *Reynolds'* products or that smoking *Philip Morris'* products was a substantial factor in causing the decedent's COPD. The decedent smoked Reynolds' products for approximately 43 years, but his smoking took place when he was relatively young and vigorous. Subsequently, he switched to Philip Morris' products, which he smoked for approximately 15 years until the start of the immunity period and for the nine months between the end of the immunity period (January 1, 1998) and his first visit with Dr. Wong (October 2, 1998). There is no plausible way that the jury, based solely on Dr. Wong's opaque testimony that smoking caused the decedent's COPD, could reasonably determine whether smoking the products manufactured by either or both of defendants was a substantial factor in causing his COPD.

Plaintiffs shall have an opportunity to address these evidentiary deficiencies prior to submission of the case to the jury. If plaintiffs do not adequately do so, the Court shall grant judgment as a matter of law in favor of defendants on all claims.

### 2. *Conflict Preemption of Design Defect Claims*

■ Defendants contend that plaintiffs' design defect claims are preempted through conflict preemption. They argue that if the jury were to impose liability on defendants for selling the cigarettes that allegedly caused the decedent's death, California law would effectively be banning tobacco products. This result, defendants contend, would impermissibly conflict with the federal Congressional determination not to ban tobacco products, a determination that was recognized by the Supreme Court in *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 138–39, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("*FDA*").

In making this argument, defendants reiterate an argument that the Court previously considered and rejected in resolving defendants' motions in limine. In rejecting the argument, the Court relied on the well-established "presumption against preemption," *see City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 122 S.Ct. 2226, 2232, 153 L.Ed.2d 430 (2002), and cited the absence of sufficient evidence or authority to overcome this presumption. Defendants have asked the Court to reconsider its earlier conclusion, suggesting that the Court overlooked the Supreme Court's holding in *FDA*. Plaintiffs, for their part, merely reiterate their contention that, as the Court previously

---

**2.** The Court adds that although there was testimony that the decedent had coughing spells and episodes of shortness of breath prior to the immunity period, there was no testimony even remotely suggesting that such events were symptoms or early warning signs of COPD.

found, there is insufficient evidence of Congress' intent to displace plaintiffs' state-law claims.

The Court declines to reconsider its earlier conclusion except in one respect, although it will address defendants' arguments more expansively. Defendants overlook the nature of the particular regulations at issue in *FDA* and misapply the Supreme Court's holdings regarding Congressional intent to the instant case. At issue in *FDA* was the validity of regulations promulgated by the federal Food and Drug Administration (the "FDA") in 1996 that purported to assert jurisdiction over the regulation of cigarettes and smokeless tobacco on the grounds that nicotine is a "drug" within the relevant statutory definition and that cigarettes and smokeless tobacco are "drug delivery devices." *Id.* at 126–27, 120 S.Ct. 1291. The Supreme Court concluded that the FDA did not have authority under the Food, Drug and Cosmetic Act (FDCA) to regulate tobacco products. In reaching this conclusion, the Court determined, *inter alia,* that were the FDA to regulate tobacco products pursuant to the FDCA, it would be forced to ban them. *See id.* at 137, 120 S.Ct. 1291.[3] But, the Court explained, Congress had passed no fewer than six statutes since 1965, the "collective premise" of which "is that cigarettes and smokeless tobacco will continue to be sold in the United States." *Id.* at 139, 120 S.Ct. 1291. Consequently, the Court concluded that "[a] ban of tobacco products by the FDA would ... plainly contradict congressional policy." *Id.* Accordingly, the FDA's assertion of jurisdiction was indirectly foreclosed by Congressional policy.

Yet crucial to the *FDA* Court's conclusion was its implicit determination that the FDA's extension of jurisdiction over cigarettes and smokeless tobacco would have resulted in a ban of *all* tobacco products, *see id.* at 137, 120 S.Ct. 1291; there was no suggestion that there would be selective regulation of tobacco products based on their design. It is this result—a *complete* ban on tobacco products—that would have conflicted with Congressional intent.

In contrast, plaintiffs' design defect claims would ban only those tobacco products that suffer from a *defective design.* Such a ban is not automatically tantamount to the categorical ban on tobacco products that, according to the *FDA* Court, would have occasioned the FDA's regulation of tobacco products under the FDCA. Nowhere does *FDA* suggest that Congress intended to displace the states' selective regulation of tobacco products that suffer from defective designs.

Indeed, defendants' argument proves too much. A hypothetical is instructive. Suppose a cigarette manufacturer tomorrow were to introduce a new type of cigarette for sale in California that contained a lethal toxin that causes the instant death of most people who smoke the cigarette. Defendants, however, argue that "the [*FDA* ] Court holds that Congress intends that *unsafe* cigarettes cannot be banned." The logical import of this argument is that California would be powerless to ban the sale of such cigarettes as having a defective design, namely their containing the lethal toxin that causes instant death. While the Court might agree with defendants that California could not ban such cigarettes solely on account of their being

3. This conclusion was based on the FDA's copious findings in its rulemaking proceedings about the deleterious effects of tobacco products on health and the relevant provisions of the FDCA that govern premarket approval of regulated devices. *See id.* at 136, 120 S.Ct. 1291 ("In view of the FDA's conclu-

sions regarding the health effects of tobacco use, the agency would have no basis for finding any such reasonable assurance of safety [as required by the FDCA]. Thus, once the FDA fulfilled its statutory obligation to classify tobacco products, it could not allow them to be marketed.").

tobacco products (which ban would consequently extend to *all* cigarettes sold in California), the Court can perceive no reason to conclude that Congress intended to deprive the states of the power to regulate and even ban tobacco products that are defectively designed in circumstances like these.

The Court also disagrees with defendants' assertion that *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), is "directly on point here." In *Geier*, the Supreme Court found District of Columbia tort law to be preempted because it imposed a duty on automobile manufacturers to install airbags in the vehicles they manufactured, which duty conflicted with federal regulations that permitted automobile manufacturers to choose from a number of different passive restraint devices to install. *See id.* at 874–75, 120 S.Ct. 1913. In contrast, the Court perceives no reason to divine from the *FDA* Court's conclusion that Congressional policy contemplates the continued legality of tobacco products that Congress gave express sanction to the designs of the specific cigarettes that were on the market in 1969 or whenever Congress passed a new tobacco-related law. The most the Court believes it may reasonably conclude is that Congress specifically intended that neither the states nor the federal government establish an across-the-board, Prohibition-style ban on tobacco products.[4]

In reaching this conclusion, however, the Court must clarify what it means by "tobacco products" and Congressional policy against a ban thereof. In *FDA*, the FDA concluded that its regulation of tobacco products was authorized based *solely* on two features of tobacco products: (1) they contain nicotine, a "drug"; and (2) they are "devices" that "deliver" nicotine to the body. *See* 529 U.S. at 131, 120 S.Ct. 1291 ("The FDA's assertion of jurisdiction to regulate tobacco products is founded on its conclusions that nicotine is a 'drug' and that cigarettes and smokeless tobacco are 'drug delivery devices.' "). Thus, in regulating "tobacco products," the FDA was regulating *all products derived from tobacco that contain nicotine and deliver nicotine to the body.* In light of the FDA's findings about the deleterious effects on health caused by "tobacco products" *generally,* the Supreme Court concluded that the FDA's exercise of jurisdiction would have resulted in a ban of *all* such products.

Given that the Supreme Court held in *FDA* that Congress intended to prevent a ban on "tobacco products" generally, this Court concludes that California law will be preempted in the instant case if, but only if, defendants are held liable for a design defect in the cigarettes smoked by the decedent that are so inherent in "tobacco products" that it would not be scientifically or commercially feasible to remove the defect. Holding defendants liable in such circumstances would effectively constitute

---

4. This conclusion is not inconsistent with the Western District of Wisconsin's discussion of a similar argument in *Insolia v. Philip Morris Inc.*, 128 F.Supp.2d 1220 (W.D.Wis.2000). In *Insolia*, the court, applying, *inter alia, FDA, supra*, held that state law was preempted insofar as it imposed a duty on the defendants not "to manufacture and sell cigarettes once they realized the danger that cigarettes posed." *See id.* at 1224. Imposing such a duty would result in a complete ban on tobacco products, which the *FDA* Court found impermissible based on Congressional policy.

But it does not follow from the premise that a state may not completely ban the manufacture and sale of tobacco products that a state is powerless to regulate the sale of tobacco products within its borders where such products are designed in an unreasonably dangerous manner. It is such selective regulation that California has applied by recognizing a private right of action against manufacturers of products that suffer from defective designs.

a ban on the manufacture of tobacco products, a result that would undeniably conflict with Congressional policy. *See Insolia v. Philip Morris Inc.*, 128 F.Supp.2d 1220, 1224 (W.D.Wis.2000). If, however, in this action liability is imposed based on a design defect in the cigarettes that is scientifically and commercially feasible to remove from the cigarettes that the decedent smoked, plaintiffs' claims will not be preempted because imposing liability would not be tantamount to a ban on tobacco products.

To determine whether this limited form of conflict preemption applies to plaintiffs' claims, the Court must consider what is, in fact, the design defect of which plaintiffs complain. The Court does so in the following section.

### 3. *Plaintiffs' Design Defect Claim Under Risk–Benefit Test*

■ Defendants contend that plaintiffs' design defect claim cannot prevail to the extent it is based on the risk-benefit test because plaintiffs have not presented sufficient evidence for a jury reasonably to conclude that a specific *design* of the cigarettes smoked by the decedent caused his death.[5] In their opposition, plaintiffs do not identify any allegedly defective design of the cigarettes smoked by the decedent. Instead, they dismiss defendants' argument, contending that "it is not the Plaintiffs' burden of proof to show the design was *defective*. It is Defendants' burden to prove the design was not defective!" (Emphasis in original.)

■ Defendants' argument is well-taken. Ironically, the very authorities that plaintiffs cite underscore the validity of defendants' argument and plaintiffs' misunderstanding of the relevant law. The portion of *Barker v. Lull Engineering Co.* that plaintiffs quote succinctly captures "the appropriate allocation of the burden of proof" in prosecuting a design defect claim: "[O]nce the plaintiff makes a prima facie showing that the injury was proximately caused by the product's *design*, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective." 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 573 P.2d 443 (1978) (emphasis added). *Barker* makes clear that in the instant case, plaintiffs bear the initial *burden of production:* plaintiffs must put forward sufficient evidence to make out a *prima facie* case that the *design* of the cigarettes at issue proximately caused the complained-of injury. If plaintiffs carry that initial burden, the *burden of persuasion* shifts to defendants to put forward sufficient evidence tending to show, by a preponderance of the evidence, that the cigarettes were not defective, *i.e.*, that the benefits associated with their design outweighed the risks of the design.

■ Plaintiffs appear to have assumed incorrectly that to make out the required *prima facie* case they need only demonstrate that the underlying injury was caused by the *product itself*.[6] This as-

---

**5.** "Under California law, a product is defectively designed if it fails to meet an ordinary consumer's expectations, or if injury is attributable to a specific design feature of the product and the risks associated with the design outweigh its benefits." *Papike v. Tambrands Inc.*, 107 F.3d 737, 743 (9th Cir.1997) (citing *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)). This latter test for products liability is known as the risk-benefit test. Plaintiffs assert a risk-benefit theory against both defendants, but they assert a consumer expectations theory only against Reynolds.

**6.** Plaintiffs pay lip service to the distinction between the design of a product and the product itself when they state that "Plaintiffs in the case at bar have satisfied their burden of proof that the design of the cigarette FRANK

sumption, however, is contrary to established California law, which requires the injury to be proximately caused by the *design* of the product. *Barker, supra; see also Moreno v. Fey Mfg. Corp.*, 149 Cal. App.3d 23, 27, 196 Cal.Rptr. 487 (1983) ("Moreno's evidence tended to show that the wrap-around design of the bumper, coupled with a gap between the end of the bumper and the side of the fender, was at least a substantial factor in causing the amputation. This established a prima facie case of causation.").[7] Plaintiffs, therefore, must put forward sufficient evidence to make out a *prima facie* case that some design feature of the decedent's cigarettes proximately caused his death.

■ Plaintiffs, however, have identified no such allegedly defective design feature, and the Court discerns no evidence in the record that gives rise to an inference that a specific design feature of the cigarettes at issue proximately caused the decedent's death.[8] To the extent that the design

defect of which plaintiffs complain is that the cigarettes contained nicotine and delivered nicotine to the decedent's body—that is, that they were "tobacco products"—plaintiffs' design defect claims are preempted because, if successful, they would result in an across-the-board ban on tobacco products, in contravention of the Supreme Court's holding in *FDA*.[9]

Accordingly, plaintiffs shall have an opportunity to put forward evidence to correct this evidentiary deficiency. If they do not do so, judgment will be entered in favor of defendants on plaintiffs' design defect claims.

### 4. *Sufficiency of Evidence on Certain Elements of Damages*

■ Defendants contend that plaintiffs have failed to present sufficient evidence on certain elements of damages. Specifically, they contend that plaintiffs have presented no evidence that they suffered lost earnings or income or that they lost house-

WHITE smoked was manufactured by Defendants and caused his death. The burden now rests on the Defendants to prove the design was not defective." Given, however, that in their opposition plaintiffs never identify the specific design of these cigarettes that plaintiffs consider defective, the Court can only conclude that plaintiffs either are unable at this point to identify any such design or do not understand the practical distinction between the design of a product and the product itself.

7. Not only is the view that plaintiffs need not put forward evidence regarding a particular design feature of the product contrary to California law, it is eminently unreasonable. If this view of the law were correct, one could imagine a virtually unending series of design defect suits based on injuries occurring from such everyday activities as one's cutting one's hand on an ordinary kitchen knife while cutting vegetables or a batter's hitting the catcher with a bat in a wild backswing during a baseball game. But the mere fact that a product like a kitchen knife or baseball bat causes injury does not mean that the injured

party may file suit based on a design defect claim.

8. Indeed, as discussed *supra*, the entirety of the evidence offered by plaintiff regarding the proximate cause of the decedent's death is Dr. Wong's testimony that the decedent's "smoking" caused his COPD and that his COPD caused his death. No jury could reasonably infer from this minimal evidence that a particular design feature of the cigarettes that the decedent smoked proximately caused his death.

9. At any rate, as defendants correctly note, plaintiffs' own expert witness, Dr. Benowitz, testified that nicotine "is not directly the cause of most of the harm. It's other things in tobacco smoke." (Tr. 903:21–22.) When asked whether nicotine itself caused any harm to the human body other than creating addiction, Dr. Benowitz responded, "Well, that's still an area of ongoing research. There may be some harmful effects, but the effects of nicotine are very small compared to the effects of the other toxic components of tobacco smoke." (Tr. 904:2–5.)

hold services as a result of the decedent's death. They also contend that plaintiffs have not presented any evidence as to what society, comfort, care, and protection (collectively, "companionship") the decedent was providing at the time of his death. In their opposition, plaintiffs contend that they are not alleging loss of support as part of their damages, but they insist that "they have presented much evidence on their loss of love, companionship, comfort, affection, society, solace, moral support, and in the case of DOROTHY WHITE, the enjoyment of sexual relations."

 Defendants correctly note that the appropriate time frame for determining the companionship offered by the decedent is the time of the decedent's death; any decline in the decedent's quality of life leading up to his death is irrelevant to plaintiffs' wrongful death claims. *See Cherrigan v. City & County of S.F.*, 262 Cal.App.2d 643, 652, 69 Cal.Rptr. 42 (1968). Since plaintiffs do not contest that they have not offered any, let alone sufficient, evidence of lost income or services, the sole issue is whether there is sufficient evidence of the companionship the decedent afforded plaintiffs at the time of his death to support an award of damages.

The Court concludes that there is indeed sufficient evidence, except with regard to Dorothy White's alleged loss of sexual relations. Elaine White testified about the events of the final fourteen days of the decedent's life, when he was in hospice care and she attended to him. (*See* Tr. 503:11–505:9.) She also testified that she misses the decedent's "companionship, his counsel, his wisdom, his company, and yes, I miss him as a father." (Tr. 519:18–19.) Although, as the Court has previously ruled, plaintiffs may not recover for grief and sorrow resulting from the decedent's death, a jury could reasonably infer from Elaine Conley's statements that *on the date of the decedent's death,* the decedent's companionship had *some appreciable value.* Of course, this conclusion does not imply that any damages based on this evidence should be in any particular amount; it only means that there is sufficient evidence for plaintiffs to receive *some* award of damages based on their wrongful death claims.

Accordingly, plaintiffs need not present additional evidence of damages, unless they wish to present evidence of Dorothy White's sexual relations with the decedent at the time of his death and evidence of lost income and services provided by the decedent at the time of his death.

### 5. *Bar of Claims by Immunity Statute*

 Defendants contend that because the decedent could have filed suit against defendants during the immunity period imposed by California Civil Code § 1714.45 but, had he done so, his suit would have been barred, plaintiffs' claims are similarly barred. This argument has no merit. Section 1714.45 arguably would have barred a suit filed by the decedent during the immunity period, but it does not follow that plaintiffs could not bring this wrongful death suit after the immunity period expired where the suit is based on conduct occurring outside the immunity period. Section 1714.45 nowise established defendants' "substantive non-liability" to the decedent for conduct occurring prior to and after the immunity period.

Accordingly, plaintiffs' claims are not barred on this basis.

### B. *Reynolds' Motion*

### 1. *Failure–to–Warn Claim Based on Events Occurring After July 1, 1969*

 Reynolds contends that plaintiffs' failure-to-warn claim, which plaintiffs as-

sert only against Reynolds, is expressly preempted by the Federal Cigarette Labeling and Advertising Act to the extent that it is premised on events occurring after July 1, 1969.[10] Plaintiffs do not dispute this contention.

Reynolds' contention is correct. *See, e.g., Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 522–24, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 171 (5th Cir.1996). Accordingly, pursuant to Rule 50(a)(1) the Court determines in favor of Reynolds the issue of whether plaintiffs' failure-to-warn claim against Reynolds can be predicated on events occurring after July 1, 1969.

### 2. *Failure–to–Warn Claim Based on Events Occurring Before July 1, 1969*

■ As Reynolds correctly observes (and plaintiffs do not dispute), to prevail on their failure-to-warn claim based on events occurring before July 1, 1969, plaintiffs must establish that Reynolds did not adequately warn the decedent "of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Anderson v. Owens–Corning Fiberglas Corp.,* 53 Cal.3d 987, 1002, 281 Cal.Rptr. 528, 810 P.2d 549 (1991). Reynolds contends that plaintiffs have failed to present sufficient evidence that before July 1, 1969, credible medical or scientific evidence of a particular risk associated with smoking cigarettes existed and that Reynolds knew or should have known about any such risk. According to Reynolds, its only conceivable duty to warn was with respect to the risks of "addiction" due

to the nicotine naturally found in cigarettes. Reynolds claims, however, that the only relevant evidence on the scientific knowledge of addiction prior to 1969—Dr. Benowitz's testimony about certain unidentified studies in the mid–1940's that showed that people injected with nicotine smoked fewer cigarettes and the Surgeon General's 1964 report that labeled smoking behavior a "habit"—is insufficient to support a finding that prior to 1969 credible scientific evidence of cigarettes' potential for addiction existed and that Reynolds knew or should have known of the risk of addiction to the nicotine in cigarettes.

■ Reynolds also correctly observes (and plaintiffs do not dispute) that to prevail on their failure-to-warn claim plaintiffs must establish that the *ordinary consumer* of Reynolds' cigarettes prior to 1969 would not have known that cigarette smoking carried the risks of which plaintiffs complain. Reynolds asserts, however, that plaintiffs have failed to establish that the risks of cigarette smoking were not well known prior to July 1, 1969.

Plaintiffs in their opposition counter by citing Dr. Benowitz's testimony about studies in mid–1940's and his testimony that "there were non-scientific people who made conclusions that nicotine was the main reason people smoked, beginning around 1900." They argue that "[a]ddiction alone is a risk and an injury" and that Dorothy White presented testimony that the decedent "was not aware of both the addiction risk and the risk to health found in cigarette smoking." Aside from these evidentiary references, plaintiffs merely state the applicable law and insist that Reynolds had a duty to warn.

---

**10.** Although there is no practical effect in the instant case, it would appear that Reynolds' argument concerns events occurring *on or after* July 1, 1969, rather than solely after July 1, 1969. Because, however, Reynolds has limited this argument to events occurring *after* July 1, 1969, the Court similarly confines its analysis.

■ Plaintiffs have thus identified two general risks from cigarettes: the risk of addiction and the risk of injury to health. With regard to the former, there is insufficient evidence in the record to establish the state of scientific or medical knowledge prior to July 1, 1969. In response to plaintiffs' counsel's question about how long nicotine has been considered an addictive drug in the scientific community, Dr. Benowitz explained that there has been "evidence" that "people are smoking for nicotine for at least 60 or 70 years"; that "there was evidence back in the '40's that nicotine was involved"; that "[c]ertainly by [the] 1964 Surgeon General's report, there was good evidence that people smoked for nicotine, that there were significant withdrawal symptoms associated with not smoking"; but, in Dr. Benowitz's view, the "final word ... that was unequivocal was really the 1988 Surgeon General's report, which looked at all the evidence over the years, and made ... a very thorough case for addiction." (Tr. 906:15–907:5.) Thus, to summarize, the entirety of testimony on the state of scientific or medical knowledge regarding addiction was that there was scientific "evidence" in the 1940's that "nicotine was involved" and that the Surgeon General in 1964 concluded that "people smoked for nicotine", but there was no solid conclusion that the nicotine in cigarettes caused *addiction* until 1988.

This evidence is insufficient for a jury to reach a reasonable conclusion as to whether the state of scientific or medical knowledge prior to July 1, 1969, was such that Reynolds knew or should have known that cigarettes had a risk of addiction. Plaintiffs must bear in mind that the testimony

offered by plaintiffs' witnesses established that "addiction" is a clinical concept, appropriate for expert testimony (which, in plaintiffs' case-in-chief, was provided by Dr. Benowitz), and that addiction is something far more potent than a mere desire; indeed, according to Dr. Benowitz, the decedent's addiction to the nicotine in the cigarettes he smoked was so powerful that it overrode his ability to control his use of cigarettes. Consequently, a jury could not reasonably conclude that just because there was "evidence" since the 1940's that nicotine is "involved" in smokers' decisions to smoke and that "people smoke for nicotine," it was known in the scientific community that there is a risk of *addiction* in cigarette smoking.[11] Thus, without further elaboration on the part of Dr. Benowitz as to how the evidence from the 1940's and the Surgeon General's 1964 report can be construed as demonstrating that there was knowledge in the scientific or medical community that cigarette smoking can cause addiction to nicotine, the jury would have to engage in pure speculation to conclude that Reynolds knew or should have known prior to July 1, 1969, that cigarette smoking bore a risk of causing addiction to nicotine. Such speculation is, of course, impermissible, and thus plaintiffs' evidence on this point is insufficient to prevent an adverse judgment on plaintiffs' failure-to-warn claim.

■ The evidence in the record is also insufficient to establish that it was not generally known to the ordinary consumer prior to July 1, 1969, that smoking cigarettes had a risk of causing addiction to nicotine. Dorothy White's testimony that the decedent "did not believe that he was

---

11. To illustrate why this evidence is insufficient, consider an analogous example: There may be evidence that sugar and caffeine are "involved" in people's decisions to drink Coca–Cola and even that people drink Coca–

Cola "for the sugar and caffeine," but it in no way follows that such evidence demonstrates scientific or medical knowledge that drinking Coca–Cola carries a risk of clinical "addiction" to Coca–Cola.

addicted" to cigarettes or nicotine does not establish whether the ordinary consumer would have known prior to July 1, 1969, that cigarettes were addictive.

■■■ As for the other risk identified by plaintiffs, the risk to one's health from smoking, the evidence is also insufficient to support plaintiffs' failure-to-warn claim. Reynolds does not appear to contend that prior to July 1, 1969, the risks to health were unknown to the ordinary consumer or to the scientific community; to the contrary, Reynolds contends that all the evidence in the record demonstrates that it was well-known to consumers prior to July 1, 1969, that cigarettes were potentially injurious to one's health. The Court agrees with this assessment of the evidence, and the Court notes that plaintiffs have offered no evidence whatever that the ordinary consumer was unaware of the health risks of smoking. As plaintiffs point out, Dorothy White testified that the decedent told her that he thought that his health problems were not caused by smoking, and she also testified that the decedent never told her that he knew that cigarettes were dangerous to his health. But not only does that testimony fail to establish that the *ordinary consumer* was unaware of the health risks of smoking, it does not even establish that the decedent *did not know* about the *health risks* of smoking; at most, it establishes that Frank White did not believe that *his* health problems were caused by smoking. For the jury to conclude that the decedent, let alone the ordinary consumer, did not know about these risks, it would have to engage in pure speculation, which it may not do.

Accordingly, the Court agrees with Reynolds that plaintiffs have failed to produce sufficient evidence both with regard to the state of scientific or medical knowledge prior to July 1, 1969 (and, relatedly, any expectation that Reynolds knew or

should have known about the risks of cigarettes), and with regard to whether an ordinary user would have readily recognized the dangers of cigarettes. Plaintiffs shall have an opportunity to address these evidentiary deficiencies. If they do not adequately do so, judgment will be entered in Reynolds' favor on the failure-to-warn claim.

### 3. *Evidence of Proximate Cause for Failure–to–Warn Claim*

■■■ Reynolds correctly contends, and plaintiffs do not dispute, that to prevail on their failure-to-warn claim, plaintiffs must put forth sufficient evidence of proximate cause. *See Skinner v. Vacaville Unified Sch. Dist.*, 37 Cal.App.4th 31, 42–43, 43 Cal.Rptr.2d 384 (1995). In the instant case, proximate cause entails a showing that had Reynolds warned the decedent of the risks of smoking, the decedent would not have smoked. Reynolds argues that plaintiffs have offered insufficient evidence to establish proximate cause—that had it warned the decedent of the risks of smoking, the decedent would not have smoked. Plaintiffs respond that "WELDON WHITE and DOROTHY WHITE have testified that FRANK WHITE believed the cigarette companies completely. This is a permissible inference for the Jury to make that *before* FRANK WHITE became addicted, i.e., before 1937, he could and would have heeded warnings on cigarette packages of the possibility of addiction and health risks.... Plaintiffs assert that if there had been warnings on [cigarette] packages anytime before 1950, FRANK WHITE would have heeded them, because of his belief that cigarette companies would not lie to him and the public about the risks of cigarettes."

The Court disagrees with plaintiffs that a jury could reasonably draw the inference that plaintiffs desire them to draw based on the evidence in the record. Plaintiffs

are correct that Weldon White testified that one of the decedent's "core values" was that "he did not believe that cigarette companies would put out a product that would be harmful to his health or to anybody else's health", (Tr. 368:16–18), and that the decedent did not ever "change that core value that cigarette companies would not put out anything harmful to health", (Tr. 369:17–19). Nevertheless, there is no evidence as to *when* that "core value" was formed or on what it was based. Thus, even if the jury were to embrace plaintiffs' theory of proximate cause, it would have to engage in pure speculation to conclude that the decedent had formed this core value by the time he was addicted in 1937 (according to plaintiffs' theory of the decedent's addiction). As for Dorothy White, the Court has reviewed the trial transcript and has located no testimony from her that the decedent believed the tobacco companies completely, as plaintiffs contend in their opposition.

Even if the jury could permissibly conclude that had Reynolds warned him of the risks of smoking prior to 1950, he would have believed the warnings, there still is insufficient evidence that he would not have smoked. There was testimony that the decedent tried to quit smoking numerous times and was unable to do so successfully, but none of this testimony even remotely suggested that had Reynolds warned him of the risks of smoking, he would have decided to smoke no longer. Nor is there any evidence that would support a reasonable inference that had Reynolds warned him of the risks of smoking prior to when he became highly addicted in 1937, he would have heeded those warnings. There are endless numbers of examples where users of products and activities that carry certain risks are warned of those risks and believe that those risks exist but nevertheless assume those risks. Consequently, given that there is no evidence whatever that had the decedent

known of and believed the risks of cigarette smoking, he would not have smoked, a jury cannot reasonably conclude that Reynolds' alleged failure to warn proximately caused his death.

Accordingly, plaintiffs shall have an opportunity to address these evidentiary deficiencies. If they do not adequately do so, judgment will be entered in Reynolds' favor on the failure-to-warn claim.

### 4. *Insufficient Evidence to Support Design Defect Claim Against Reynolds Under Consumer Expectations Test*

Reynolds, citing *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), and *Soule v. General Motors Corp.*, 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 882 P.2d 298 (1994), correctly contends that to succeed on their design defect claim under the consumer expectations test, plaintiffs must establish that an ordinary consumer would not have recognized the risks of smoking and that the products' performance did not meet the minimum safety expectations of its ordinary consumers. Reynolds argues that plaintiffs have introduced no evidence regarding the "minimum safety expectations" of the ordinary smoker and no evidence that the cigarettes the decedent smoked failed to perform as safely as the ordinary consumer expected. Plaintiffs counter that "the experience of DOROTHY WHITE and JAKE WHITE is relevant and probative of consumer expectations in the 1930's" and that "[i]n 1930, when FRANK WHITE began smoking, consumers, including FRANK WHITE himself, had no knowledge at all about the health risks of smoking, or their addictive properties." Plaintiffs have not offered any citations to the record in support of their assertions.

The Court agrees with Reynolds that there is insufficient evidence on both

points that Reynolds has raised. Jake White testified that in the 1930's "we" did not know that "there was anything wrong with smoking." (Tr. 533:10–11; *see also* Tr. 530:13–16, 533:8–534:6.) Dorothy White did not offer similar testimony, although she testified that *she* became aware that cigarettes were "very bad" by the early 1950's. (Tr. 790:11–14.) Although this testimony is arguably probative of whether the decedent *knew* of the risks of smoking, it is not probative of what the *minimum safety expectations* of the *ordinary consumer* of cigarettes were, nor is it probative of whether cigarettes performed less safely than the ordinary consumer expected them to perform. For all the evidence reveals, the ordinary consumer of cigarettes in the 1930's and thereafter may have expected that any rod-shaped object containing tobacco that the consumer burned and inhaled would have deleterious effects on health and could be addictive, even though the ordinary consumer may not have *known* whether consuming such a product in fact had those effects. But the evidence in the record simply does not speak to this issue, nor does it give rise to any reasonable inference regarding what the expectations of the ordinary consumer were and whether cigarettes performed as safely as expected. Plaintiffs' failure-to-warn claim is therefore not supported by sufficient evidence in these two respects.

Accordingly, plaintiffs shall have an opportunity to address these evidentiary deficiencies. If they do not adequately do so, judgment will be entered in Reynolds' favor on plaintiffs' design defect claim against Reynolds to the extent that it is based on the consumer expectations test.

### 5. Insufficient Evidence to Support Design Defect Claim Against Reynolds Under Risk–Benefit Test

In arguing that there is insufficient evidence for plaintiffs to prevail on their de-sign defect claim against Reynolds to the extent that it is based on the risk-benefit test, Reynolds incorporates by reference the arguments presented on this point in the Joint Motion, and plaintiffs incorporate by reference the arguments presented in their respective opposition. Accordingly, the Court follows suit and incorporates by reference its analysis and conclusions set out in Part A.3 of the Discussion section of this Order, *supra*. Plaintiffs are therefore put on notice that their design defect claim against Reynolds, to the extent it is based on the risk-benefit test, is deficient for the reasons and in the respects identified *supra*.

### 6. Insufficient Evidence that Design Defect in Reynolds' Products Proximately Caused the Decedent's Death

Reynolds argues that there is insufficient evidence for a jury reasonably to find that a design defect in Reynolds' products proximately caused the decedent's death. In so arguing, Reynolds effectively reiterates the argument made in the Joint Motion and addressed in Part A.3 of the Discussion section of this Order, *supra,* that plaintiffs are obligated to identify a *design feature* of the cigarettes smoked by the decedent that plaintiffs allege to be defective and to demonstrate that this design feature proximately caused his death; Reynolds contends, however, that plaintiffs have failed to offer sufficient evidence on this point. Reynolds adds that the only evidence regarding an alternative cigarette design offered by plaintiffs was the testimony of Dr. Farone, but that evidence related only to Philip Morris' cigarettes. Plaintiffs respond by repeating that Dr. Wong testified that smoking was the cause of the decedent's COPD and that COPD caused his death, and they incorporate by reference their opposition to the Joint Motion.

The appropriate analysis of these arguments is in all material respects identical to that employed by the Court in Parts A.2 and A.3 in the Discussion section of this Order, *supra.* That analysis leads to the following conclusions: a jury could not reasonably infer that, based solely on Dr. Wong's testimony, smoking *Reynolds'* cigarettes was a substantial factor in bringing about the decedent's COPD; and plaintiffs have not put forward sufficient (or any) evidence to identify any design defect in Reynolds' cigarettes that proximately caused the decedent's death. Accordingly, plaintiffs' design defect claim against Reynolds suffers from the same deficiencies identified in the Court's analysis of plaintiffs' design defect claims in the context of the Joint Motion.

Plaintiffs shall have an opportunity to address these evidentiary deficiencies. If they do not adequately do so, judgment will be entered in Reynolds' favor on plaintiffs' design defect claim against Reynolds.

### *CONCLUSION*

For the foregoing reasons,

IT IS HEREBY ORDERED THAT:

1. Defendants' Joint Motion for Judgment as a Matter of Law [Docket No. 408] is DENIED WITHOUT PREJUDICE to its being renewed under the circumstances set out *infra* and in accordance with the procedures set out *infra;*

2. Defendant R.J. Reynolds Tobacco Company's Motion for Judgment as a Matter of Law [Docket No. 404] is DENIED WITHOUT PREJUDICE, such that—

 a. Pursuant to Rule 50(a)(1) the Court determines in favor of Reynolds the issue of whether plaintiffs' failure-to-warn claim against Reynolds can be predicated on events occurring after July 1, 1969; and

 b. The motion is otherwise DENIED WITHOUT PREJUDICE to its being renewed under the circumstances set out *infra* and in accordance with the procedures set out *infra;*

3. At the close of defendants' case-in-chief, plaintiffs shall have an opportunity to correct the evidentiary deficiencies identified in the body of this Order *supra,* as follows:

 a. *Immediately after* the close of defendants' case-in-chief, plaintiffs may reopen their case-in-chief to allow any witness or witnesses to testify and to otherwise introduce evidence *for the limited purpose* of addressing the evidentiary deficiencies identified in the body of this Order (this presentation of testimony and evidence shall hereinafter be referred to as the "Case-in-chief Extension");

 b. Plaintiffs may *not* attempt to introduce in the Case-in-chief Extension any testimony or other evidence that is not relevant to addressing the evidentiary deficiencies identified *supra,* and on defendants' objection any such irrelevant testimony or other evidence shall not be received in evidence;

 c. If plaintiffs are unprepared or unwilling to present their Case-in-chief Extension *immediately after* the close of defendants' case-in-chief, plaintiffs' inability or refusal to do so shall be construed as a waiver of the opportunity afforded to plaintiffs by the Court in this Order to correct the evidentiary deficiencies identified *supra;*

 d. Plaintiffs shall have *two hours* to examine (on direct and on re-direct) any such witnesses in their

Case-in-chief Extension, but any portion of the allotted time that plaintiffs do not use in their Case-in-chief Extension will not be available to plaintiffs after they re-close their case-in-chief;

e. Defendants shall have between them *two hours* to examine (on cross and on re-cross) these witnesses and, if they so desire, to re-open their case-in-chief to present additional testimony and other evidence for the limited purpose of responding to the evidence presented by plaintiffs in their Case-in–Chief Extension, but any unused portion of these two hours shall not be available after plaintiffs and defendants have finally closed their respective cases-in-chief;

f. If defendants choose to re-open their case-in-chief to respond to the evidence presented in plaintiffs' Case-in-chief Extension, they shall do so *immediately after* the close of plaintiffs' Case-in-chief Extension;

g. The examination of any witnesses and introduction of any other evidence in plaintiffs' Case-in-chief Extension and in any responsive portion of defendants' re-opened case-in-chief shall be conducted consistent with the ordinary sequence of examination (direct, cross, re-direct, re-cross), and the admissibility of such testimony and other evidence shall be subject to the Federal Rules of Evidence, the Federal Rules of Civil Procedure (including Rules 26 and 37), all other applicable law, and all Orders of the Court in this action; and

h. If defendants do not re-open their case-in-chief to respond to plain-tiffs' Case-in-chief Extension, plaintiffs' rebuttal case shall proceed *immediately after* the close of their Case-in-chief Extension, but if defendants do re-open their case-in-chief, plaintiffs' rebuttal case shall proceed *immediately after* defendants re-close their case-in-chief;

4. Plaintiffs shall meet and confer with defendants *no later than 5:00 p.m. on December 27, 2002,* to explain in good faith what testimony and evidence, if any, plaintiffs intend to introduce in their Case-in-chief Extension;

5. *No later than the commencement of trial on December 30, 2002,* plaintiffs shall file with the Court (by hand-delivering the original and three copies to the Deputy Courtroom Clerk) and shall serve on counsel for defendants a Supplemental Witness List setting forth the witnesses that plaintiffs intend to call in their Case-in-chief Extension, a brief summary of their anticipated testimony, and any exhibits plaintiffs intend to introduce through these witnesses;

6. *Any failure by plaintiffs to comply substantially with any of the requirements imposed in the preceding paragraphs shall be construed by the Court as a waiver of the opportunity afforded by this Order to correct the evidentiary deficiencies in plaintiffs' case identified herein;*

7. At any time following the close of plaintiff's Case-in-chief Extension but prior to submission of the case to the jury, defendants may renew their motions for judgment as a matter of law, but solely to the extent that they rest on any deficiencies

identified in this Order that defendants believe not to have been cured by the submission of additional evidence (that is, defendants should not reiterate any arguments presented in the instant motions that the Court has expressly considered and rejected); and

8. If and when defendants renew their motions for judgment as a matter of law, the Court will announce whether plaintiffs may file an opposition or oppositions and, if the Court announces that they may do so, the date and time by which plaintiffs must submit their opposition or oppositions.

IT IS SO ORDERED.